# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Milton I. Shadur | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 99 C 5699 | **DATE** | 5/17/2002 |
| **CASE TITLE** | Arachnid, Inc. vs. Merit Industries, Inc., et al | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]



**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. This opinion, faithful to the teaching of Markman, has construed the disputed terms in Claims 1,3,14 and 18 as a matter of law. With that done, it now becomes necessary to determine the next steps needed to move the case forward for ultimate disposition. This Court sets a status hearing for 8:45 a.m. May 30, 2002.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | | **Document Number** |
| | No notices required. | | number of notices | |
| ✓ | Notices mailed by judge's staff. | | | |
| | Notified counsel by telephone. | | MAY 2 0 2002 | |
| | Docketing to mail notices. | | date docketed | 35 |
| | Mail AO 450 form. | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | 5/17/2002 | |
| SN | courtroom deputy's initials | | date mailed notice | |
| | | Date/time received in central Clerk's Office | SN mailing deputy initials | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

DOCKETED

MAY 2 0 2002

ARACHNID, INC.,                    )
                                   )
            Plaintiff,             )
                                   )
      v.                           )      No.  99 C 5699
                                   )
MERIT INDUSTRIES, INC., et al.,    )
                                   )
            Defendants.            )

MEMORANDUM OPINION AND ORDER

Arachnid, Inc. ("Arachnid") has brought this patent

infringement action against Merit Industries, Inc. and Millennium

Reserve Corporation (collectively "Merit"),[1] alleging that Merit

has infringed Arachnid's United States Patent No. 5,114,155[2] for

a "System for Automatic Collection and Distribution of Player

Statistics for Electronic Dart Games."  This opinion takes the

first of the two steps required to determine whether claims of

Patent '155 have been infringed:  conducting a Markman analysis

(Markman v. Westview Instruments, Inc., 517 U.S. 370 (1996),

aff'g 52 F.3d 967 (Fed. Cir. 1995) (en banc)) to construe the

---

[1] On August 19, 1998, Merit Industries, Inc. along with its
sole stockholder sold substantially all of its assets and the
right to use the name to Merit Acquisition Corporation.  After
the sale, seller Merit Industries, Inc. changed its name to
Millennium Reserve Corporation and purchaser Merit Acquisition
Corporation changed its name to Merit Industries, Inc. (M. Mem.
1).

[2] In conformity with conventional practice, this opinion
will refer to the patent in suit by its last three digits:
"Patent '155."  All citations to paragraphs of the applicable
statute, 35 U.S.C. §112, will take the form "Section 112 ¶ --."



claims by determining their scope and meaning. To that end each
party has submitted a full set of claim construction memoranda,[3]
enabling this Court to address each of the disputed claim
elements as a matter of law.[4] But first a brief review of claim
construction principles will obviate the need for needless
repetition in the discussion that follows.

## Claim Interpretation

Our American patent system serves two equally important
goals: to secure the patentee's rights (the definitional goal)
and to put others on notice of what the patentee has removed from
the public domain for the life of the patent (the notice goal)
(Markman, 517 U.S. at 373, quoting McClain v. Ortmayer, 141 U.S.
419, 424 (1891)). Hence cases such as Burke, Inc. v. Bruno
Indep. Living Aids, Inc., 183 F.3d 1334, 1340 (Fed. Cir. 1999)
instruct that the language of the documents constituting the
public record--the claims, the specification and the prosecution
history--should be the primary source for construing patent
claims. Extrinsic evidence, such as expert testimony, should be
relied on only if analysis of that intrinsic evidence fails to

---

[3] Arachnid and Merit's initial memoranda are cited "A. Mem.
--" and "M. Mem. --," with their responsive memoranda cited "A.
Resp. --" and "M. Resp. --," and their reply memoranda cited "A.
Reply --" and "M. Reply --." Any citations to other submissions
also use the "A." and "M." designations.

[4] Markman calls for construction of the claims as a matter
of law before the factual application of those claims to the
accused products can take place.

resolve an ambiguity in the disputed claim term (<u>Vitronics Corp.</u> <u>v. Conceptronic, Inc.</u>, 90 F.3d 1576, 1583 (Fed. Cir. 1996)).

That being said, a court may nonetheless rely on dictionary definitions in construing (though not in contradicting) claim terms, even though such dictionary evidence is extrinsic (<u>id</u>. at 1584 n.6). As <u>Vitronics</u>, <u>id</u>. at 1582 explains, because claim terms are given the ordinary and customary meaning ascribed to them by persons experienced in the field of the invention, dictionaries may often be useful to that end. But reliance on dictionary definitions is improper where a patentee has chosen "to be his own lexicographer" and has clearly stated in the patent specification or file history that a term has been given a special definition (<u>id</u>.). In such a case the special definition controls over the ordinary and customary meaning.

Moreover, while the specification "is the single best guide to the meaning of a disputed term" (<u>id</u>.), claim language may be broader than any limitations set forth in the specifications. As <u>Kemco Sales, Inc., v. Control Papers Co.</u>, 208 F.3d 1352, 1362 (Fed. Cir. 2000) (emphasis and internal quotation marks omitted) has cautioned, quoting from earlier Federal Circuit caselaw:

> This court has consistently adhered to the proposition
> that courts cannot alter what the patentee has chosen
> to claim as his invention, that limitations appearing
> in the specification will not be read into claims, and
> that interpreting what is meant by a word in a claim is
> not to be confused with adding an extraneous limitation
> appearing in the specification, which is improper.

Section 112 ¶6 governs the construction of so-called "means-plus-function" elements of patent claims:

> An element in a claim for a combination may be
> expressed as a means or step for performing a specified
> function without the recital of structure, material, or
> acts in support thereof, and such claim shall be
> construed to cover the corresponding structure,
> material, or acts described in the specification and
> equivalents thereof.

Use of the word "means" in a patent claim raises a presumption that the patentee used the term with the rules of Section 112 ¶6 in mind (Al-Site Corp., v. VSI Int'l, Inc., 174 F.3d 1308, 1318 (Fed. Cir. 1999)).

Construction of means-plus-function claim elements involves two steps: (1) identification of the function recited in the claim and (2) identification of the structure (or structures) described in the specification that can perform that function (Micro Chem., Inc. v. Great Plains Chem. Co., 194 F.3d 1250, 1257-58 (Fed. Cir. 1999)). Courts may not adopt functions different from those explicitly recited by claims, nor may they incorporate structure beyond what is necessary to perform the claimed function (id. at 1258). Micro Chem., id. also teaches:

> Identification of corresponding structure may embrace
> more than the preferred embodiment. A means-plus-
> function claim encompasses all structure in the
> specification corresponding to that element and
> equivalent structures....When multiple embodiments in
> the specification correspond to the claimed function,
> proper application of §112, ¶6 generally reads the
> claim element to embrace each of those embodiments.

Here the parties are in essential agreement as to which of

4

the disputed claim elements require means-plus-function analysis,
and with few exceptions they agree on the function of each of
those elements.  Where disputes arise is in the identification of
the structures disclosed by the patent specification that can
perform the functions for the means-plus-function elements.

## Patent '155's Subject Matter

Patent '155 discloses a method and apparatus for conducting
dart leagues or tournaments in which "a plurality of remotely
located electronic dart games [are] connected via a communication
medium to a central control device enabling bidirectional
communication between the central control device and the
plurality of remotely located electronic dart games" (Patent '155
abstract).  In its preferred embodiment, the invention allows
players in different locations to participate in one dart league
or tournament, although the patent recognizes an alternate
embodiment in which all of the dart games are situated at the
same location.  Each dart game receives information from and
transmits information to player cards assigned to each
participant.  In a preferred embodiment, each location has a
master game that receives information from all non-master games
through a communication link and in turn transmits that
information to the central control device, which calculates
player standings and transmits that information back to the
remote locations.

## Ordinary Skill in the Art

Finally before this opinion turns to construction of the
elements of the Patent '155 claims, one preliminary dispute
between the parties must be resolved:  determining who
constituted a "person of ordinary skill in the art" at the time
Patent '155 was issued in 1992.[5]  That issue breaks down into two
parts: (1) what exactly is the "art" at issue and (2) who
qualifies as a "person of ordinary skill" in that art?

Arachnid contends that the art in question was that of
"electronic dart leagues and dart tournaments" (A. Mem. 11), and
it quotes its proposed expert witness for the proposition that a
person of ordinary skill in that art (id. at 12):

> has knowledge, understanding and experience in the
> operations of electronic dart game machines, and in the
> marketing, promotion and management of electronic darts
> in league and tournament play, has field experience in
> the operation, setup, and maintenance of electronic
> dart game machines, and has operated electronic dart
> game machines at multiple locations in which regularly
> scheduled electronic dart promotions occur.

Merit counters that the relevant field of art is "the design and
development of software and electrical circuitry for the
transmission of information between electronic apparatus" (M.
Resp. 5) and that a person of ordinary skill in the art

---

[5] More typically that issue would be addressed during the
validity phase of a patent infringement suit.  It is necessary to
resolve it at this point because part of the parties' dispute as
to claim construction revolves around how widely or narrowly the
art in question is defined.

necessarily had a background in electrical engineering (M. Resp. 4). Neither side has it just right.

To define the relevant art, a court must look to "the nature of the problem confronting the would-be inventor" (<u>Ryko Mfg. Co. v. Nu-Star, Inc.</u>, 950 F.2d 714, 716 (Fed. Cir. 1991)). Here the nature of the problem was neither "electronic dart leagues and dart tournaments" nor "the design and development of software and electrical circuitry." Patent '155 did not claim to have invented either electronic dart leagues and tournaments or particular software and electrical circuits. Instead it is directed to "a method and apparatus for automating data transfer and management of a dart league or tournament" (Patent '155 2:13-15).[6] That defines the relevant art.

That being so, a person of ordinary skill in the art at the time would have had an understanding of how electronic dart games, leagues and tournaments operated, as well as training or experience (but not necessarily an engineering background) in the use of pre-existing hardware and software systems that could be used to create an automated system. With that issue out of the way, it is time to turn to the construction of the various claim elements at issue. Unsurprisingly, that begins with Claim 1.

_____

[6] Arachnid has provided a copy of the patent at A. Ex. A. Further citations to the patent itself will follow the convention of "column number:line numbers," without repeating "Patent '155."

<u>Claim 1</u>

Here is Claim 1 (8:1-16):

1.   A method of conducting dart leagues or tournaments
utilizing a plurality of electronic dart games, each
dart game having means for receiving, storing, and
transmitting data, said method further utilizing a
central control device (CCD) having means for
processing, inputting, storing and outputting data,
said method comprising the steps of:

> connecting the plurality of the electronic dart
> games to the central control device via a
> communication medium;
>
> inputting data on each player into the central
> control device via the inputting means; and
>
> communicating bidirectionally between the central
> control device and the plurality of electronic
> dart games via the communication medium.

Arachnid and Merit dispute the meaning of a number of terms in

that claim.

Unfortunately, here as elsewhere Merit's submissions seem to

exhibit its pursuit of goals other than that appropriate for the

<u>Markman</u> phase of patent litigation.  For instance, its Mem. 3-6

are impermissibly devoted to contentions that essentially urge

the invalidity of Patent '155, an issue that may become ripe for

consideration only after this Court has decided what the patent

means--but not now.  And by like token, too much of Merit's

approach is devoted to its attempts to rewrite the patent in its

own way, doubtless looking forward to the opportunity to argue

that Merit does not infringe on the quite different patent that

it would reconstruct.  Those things certainly do not help this

Court much in the <u>Markman</u> process, and Merit's counsel apparently do not recognize the risk that urging arguments that are thus suspect could conceivably spill over to taint other arguments that are substantively more defensible. But on to the merits.

<u>"dart game having means for receiving...data"</u>

Both parties agree that the function of the just-quoted means-plus-function element is the receipt by each dart game of data or information relating to a dart tournament or league (A. Mem. 16, M. Resp. 6). They offer differing constructions of the structures associated with that function, with Arachnid claiming "any one or more of a player card or other portable data storage device such as an integrated circuit card and interface, keyboard, modem, a touch pad, a switch or switches, or computer I/O processing circuitry" (A. Mem. 18) and with Merit seeking to limit the structures to "(1) a computer modem and (2) a player card reader, capable of reading non-contact IC [integrated circuit] cards" (M. Resp. 7)

Merit's argument that the patent discloses the use of only non-contact IC cards as player cards lacks any intrinsic support. Patent '155 describes the use of player cards, which are specifically defined as "any portable data storage device" (4:34-35). It goes on to say, "<u>For instance</u>, the player card...<u>may</u> be a noncontact integrated circuit (IC) card as disclosed in" a specified recent patent (4:35-36, emphasis added). That is not

9

properly read as a limitation on the devices that can fill the role of player cards, but instead as providing an example (the universally understood meaning of "For instance") to ensure that readers of the patent understand that it could include the disclosure in a recent invention. Because the patent specifies that any portable data sharing device--including both contact and non-contact IC cards--can serve as a player card, a reader for any type of those devices can serve as the structure for receiving data.

Some of the structures Arachnid proposes are not, however, supported by the patent specification. For example, Arachnid claims that player cards and other portable data storage devices are themselves structures for receiving data, but nothing in the patent supports a finding that such devices, which are wholly independent of the dart game, fit the claim language of "each dart game having means for receiving...data." In like fashion Arachnid lists a touch pad, a switch or switches and computer I/O processing circuitry as structures that fulfill that function, but nothing in the specification supports that construction either.[7]

---

[7] Arachnid cites to the report of its "expert" Howard Smoyer ("Smoyer"), who states that someone of ordinary skill in the art would have understood upon review of the patent that those devices could serve as means of receiving data (A. Ex. C 11). Apart from the question whether Smoyer would qualify as an expert (which this Court finds it unnecessary to resolve at this point in the case), Arachnid offers no evidence that those devices were

On the other hand, Arachnid correctly lists keyboards, electronic wire interlink and Spider Writer™ Technology as structures for receiving data, each of which is disclosed in the patent (4:50-53, 3:66-4:2, 5:34-38). "Means for receiving... data" is therefore construed as any one or more of a computer modem, player card readers (capable of reading any portable data storage device), keyboard, electronic wire interlink and Spider Writer™ Technology.

"dart game having means for...storing...data"

Again both sides agree that the just-quoted means-plus-function element addresses the function of storing dart game league-related or tournament-related data (A. Mem. 18, M. Mem. 20). They also agree that the corresponding structure is computer memory. Merit urges that the structure be restricted to "non-volatile computer memory located within the electronic dart game" because that is the only type of memory that is retained after a device is turned off (M. Mem. 20). Because nothing in the claim or patent specification requires that data be retained in the dart games after they are turned off, no support exists for Merit's effort to engraft the term "non-volatile" into this

_____

known to be equivalent to any of the specified structures or were otherwise disclosed in the patent. This is not an instance in which the patent language is ambiguous (it is conventional wisdom that litigants' disagreement over the meaning of language does not equate to ambiguity), and so the testimony of Arachnid's claimed expert is entitled to no weight (Vitronics, 90 F.3d at 1584).

element.

Arachnid contends that the structures for storing data are
"computer memory, electronic memory circuitry, hardware or
software including IC player cards if part of the dart game,
and/or equivalent structures" (A. Mem. 18).  Nothing in the
specifications discloses the use of IC cards as part of the dart
games themselves--those cards are always disclosed as storage
devices external to the games.  According to the patent
specification, computer memory and electronic memory circuitry
are the dart game structures for storing data (6:9-13).  That
construction is adopted.

"dart game having means for...transmitting data"

Arachnid and Merit agree that the just-quoted means-plus-
function element discloses the function of transmitting data from
a dart game to some other destination (A. Mem. 19, M. Mem. 19).
Merit argues, as it did as to the "means for receiving" element,
that the only structures disclosed for transmitting are a
computer modem and non-contact IC player card reader.  That
effort to limit the structure to non-contact IC cards fails for
the same reasons as stated earlier.  Modems and player card
reader/writers or other portable data storage device interfaces
constitute the structures for transmitting data.  Although
Arachnid also posits that the means for transmitting data can
also include "electronic I/O processing circuitry...or computer

12

peripheral device hardware and software" (A. Mem. 21), it
provides no showing that those structures are disclosed by the
patent.[8]

"CCD having means for processing"

Both parties agree that the function of the just-quoted
means-plus-function element is the processing or manipulation of
data (A. Mem. 21, M. Mem. 20). Merit argues that the means for
processing should be construed as limited to the central
processing unit ("CPU") of a computer (M. Mem. 20).[9] Arachnid
proposes a more expansive construction that includes other
"electronic processing circuitry" because the dart games contain
electronic processors that are not themselves computers (A. Reply
11-12). That argument fails because this element discloses the
CCD's means for processing, not the processing capabilities of
the dart games. Merit's construction is adopted.

_____

[8] This is the first of several places where Arachnid
includes "equivalents" of specified structures as also coming
within the plain meaning of phrases in Patent '155 (A. Mem. 20).
Because the current status of the doctrine of equivalents is
awaiting definition by the Supreme Court in Festo Corp. v.
Shoketsu Kinzoku Kabushiki Co., No. 00-1543, which was argued
January 8 of this year (see 70 U.S.L.W. 3471-73), this opinion
expresses no view either way on that subject.

[9] Both sides agree that the CCD is a computer system,
including typical features like a CPU, memory, keyboard, modem
and printer (A. Mem. 21).

<u>"CCD having means for...inputting...data"</u>[10]

Again the parties agree that the just-quoted language denotes a means-plus-function element, with its function being the entry of data into the CCD (A. Mem. 22, M. Mem. 21). Arachnid claims that the structures performing that function include "one or more of electronic I/O processing circuitry, peripheral hardware device, portable data storage device interface, modem, or keyboard" (A. Mem. 23), while Merit argues that the only structures described in the patent are a computer modem and computer keyboard (M. Mem. 21).

Patent '155 discloses the use of a modem for inputting data into the CCD from remotely-located master games (3:61-63) and explains that "[p]layers register for a dart league or tournament by inputting the information at the location of the CCD" (5:24-25), a step that anyone of ordinary skill in the art would presume requires the use of a computer keyboard. It also discloses the use of wires to create an electronic interlink between dart games situated at the same location as the CCD (3:66-4:2) and an interface for downloading data into the CCD from player cards (5:12-21). Each of those structures meets the means-plus-function test for the element at issue.

---

[10] To avoid undue awkwardness, this and later quotations have omitted the parentheses around "CCD" in the patent itself.

"CCD having means for...storing...data"

    Both parties agree that the just-quoted language constitutes
a means-plus-function element, with its function being the
storage of data. They also agree that the structure for storing
data is the computer memory system, although Merit seeks to
restrict that structure to non-volatile computer memory (M. Mem.
21). As discussed earlier, no evidence supports such a
restriction, and the element is therefore construed to include
any computer memory system included in the CCD.

"CCD having means for...outputting data"

    In this instance the parties agree that the just-quoted
language constitutes a means-plus-function element, but they
differ as to both the function and the structure. Merit argues
that the function is "transmitting data from the CCD to the dart
games" and that the only structure in the patent that performs
that function is a computer modem (M. Mem. 21-22).

    Not so--the claim language embraces the transmission of the
data from the CCD to any external destination. Intrinsic
evidence supports the finding, which this Court makes, that a
number of structures can serve as means of outputting data from
the CCD: a player card or other portable data storage device
interface (5:12-32), a modem (3:61-63) or an electronic interlink
(3:63-4:2). Though Arachnid further suggests that a display
unit, printer and electronic processing circuitry can be

15

structures for outputting data, nothing in the patent
specifications links those structures to the CCD for data
output--instead they are linked with the dart games themselves
(see 5:57-59, 7:54-57, 1:63-2:4).

"connecting"

Merit proposes that "connecting" be construed as meaning
"establishing an electrical continuity between" the CCD and dart
games (M. Mem. 11-12). That proposal is drawn primarily from the
definition of "connection" found in an electrical engineering
dictionary.

But even apart from Merit's potentially suspect
transmutation from "connecting" (the word used in Patent '155) to
"connection,"[11] Merit's attempt to engraft the word "electrical"
as a limitation on the term "connecting" is inappropriate for
several reasons. As indicated earlier, the relevant art here is
not electrical engineering per se. Further, a dictionary
definition may not be used if it contradicts or varies the claim
language (Vitronics, 90 F. 3d at 1584), and that is precisely
what Merit's proposed definition would do here. Nothing in
Patent '155 specifies that the connection between the CCD and the

_____

[11] After all, in normal English usage the verb "connect" is
wholly generic, carrying no implication that is limited to the
electric or electronic fields. By contrast, the noun
"connection" has some more specialized connotations that might
arguably lend some force to Merit's argument--though it is
ultimately unpersuasive even in those terms.

dart games must be "electrical."  It is at least questionable

whether the preferred embodiment of a modem qualifies as an

"electrical" connection and another specified embodiment--the use

of game cards and routemen--obviously does not include electrical

connection.[12]  Intrinsic evidence from Patent '155 plainly

supports Arachnid's construction of "connecting" as having the

less restricted meaning of simply joining in a communications

path (A. Mem. 26-28).  That construction is adopted.

"via a communication medium"

Merit again proposes a construction paraphrased from

definitions in an electrical engineering dictionary: "the

physical environment by which an electromagnetic communication

signal may travel between two points without signal alternation

or modification" (M. Mem. 13).  Once again that proposal seeks to

impose restrictions that are in no way supported by the intrinsic

patent evidence.  Patent '155 lists a number of possible

communication media: telephone lines and modems, electric wires

and routemen manually transporting player and operator cards.

That normal and nonrestrictive meaning is adopted.

"communicating bidirectionally"

Merit asserts at its Mem. 15-16 that for communication to be

bidirectional, "data must proceed in both directions while the

_____

        [12] While Arachnid labels that as a "preferred" embodiment,
Patent '155 itself says it is an alternative to the preferred
embodiment (5:21-23).

communication is occurring" (M. Mem. 15).  In an effort to

support that contention, M. Mem. 15 quotes a definition of

"bidirectional" from an electrical engineering dictionary

(Hargrave's Communications Dictionary (2001)) as "capable of

operation in both a forward and reverse direction."  But that

quotation itself belies Merit's proposed construction, for it

requires only that data be able to flow in either direction, not

that data must flow in both directions at the same time.  And

nothing in Patent '155 justifies Merit's strained construction of

"bidirectional."  Arachnid's proposed more straightforward

meaning of the term as "transferring information in both

directions between the dart games and the CCD" (A. Mem. 32) is

adopted.

Claim 3

Claim 3 incorporates all aspects of Claim 1 and Claim 2,[13]

adding this language (8:22-37):

> each dart game further comprising means for displaying
> data, said method further comprising the steps of:
>
>> recording play-by-play of each player
>> automatically via the game storing means upon

---

[13] Claim 2 reads:

> The method of conducting dart leagues or
> tournaments as set out in claim 1, wherein the
> plurality of electronic dart games are situated at
> one or more locations remote from the central
> control device.

None of that language has been disputed by the parties.

impact of a dart thrown by a player striking a
dart board on said player's respective dart game;

calculating a score of each player resulting from
a dart thrown by a player striking a respective
dart board of the player;

displaying at each location current scores of
every player participating at that location; and

polling each remote location by the central
control device via the communication medium at a
predetermined time in order to upload data from
each remote location and process data.

Several of the terms in that claim are the subject of
disagreement between the parties.

<u>"means for displaying data"</u>

This just-quoted means-plus-function element discloses the
function of displaying data (A. Mem. 33, M. Mem. 22). Arachnid
contends that the structures specified in Patent '155 that
perform that function are "one or more of a video monitor,
display, CRT screen, lighted display or printer associated with
it to display data" (A. Mem. 34). Predictably Merit submits a
narrower construction, proposing that the structure be limited to
"an external portable video display connected to the dart game"
(M. Mem. 22).

Intrinsic patent evidence discloses two structures that do
fulfill this function: a portable display such as a video display
connected to the master dart game (5:42-45) and, disproving
Merit's overly narrow reading, the visual displays internal to
the individual dart games (5:57-59). And as for Arachnid's

contention that a printer also qualifies as a "display"
structure, it cannot be disputed (1) that a printer is a "means"
and (2) that its function is that of "displaying data"--thus
validating the rest of Arachnid's position as to the element now
under consideration.

"game storing means"

Merit argues that the just-quoted term is indefinite and
incapable of construction (M. Mem. 23). But that argument
disregards the fact that Claim 3 is dependent on Claim 1, so that
the fully-quoted term ("the game storing means") clearly refers
back to the Claim 1 term "dart game having means for...storing."

Merit attempts to counter that "[t]he applicants' failure to
unambiguously identify the 'game storing means' as the dart
game's 'means for storing' makes it unclear whether the element
is found at the CCD, dart game or some other intermediate point"
(M. Resp. 12). But that argument in turn ignores the plain
language of Claim 3, which in part discloses "each dart game
further comprising means for displaying data, said method further
comprising the steps of: recording play-by-play of each player
automatically via the game storing means..." (8:21-25, emphasis
added).

In sum, "game storing means" is not at all indefinite. It
plainly refers to structures within the dart games, and it is
therefore subject to the same construction already given to

20

"means for storing" in Claim 1.

<u>"polling each remote location by the CCD"</u>

Even though both parties expend considerable energy expounding on the construction of the just-quoted term, in the end both also concede that they agree on its plain meaning: requesting information from each remote location of the dart game to facilitate data transfer (A. Mem. 38, M. Mem. 23).[14] That construction is adopted.

Claim 14

Claim 14 incorporates all aspects of Claims 1 and 2 and adds in part (9:51-10:3):

> a communication medium coupling the plurality of remotely located electronic dart games to the central control device and enabling bidirectional communication between the central control device and the plurality of remotely located electronic dart games, wherein the receiving and transmitting means of the dart games and the inputting and outputting means of the CCD interface with the communication medium.

As such, Claim 14 is the apparatus counterpart to the method of Claim 1. That being so, the parties agree that analogous terms of Claim 14 must be interpreted in a manner consistent with the construction of Claim 1. Three of those terms have been disputed by the parties.

_____

[14] Merit correctly points out that Arachnid, without explanation, asserts at one point that polling means "retrieving" information (A. Mem. 40). Because Arachnid fails to elaborate an argument for that construction or to respond to Merit's challenge on that score, that assertion is disregarded.

"coupling"

"Coupling" is the counterpart to the Claim 1 term
"connecting." Accordingly, the same meaning--establishing an
association to allow communication between electronic devices--is
adopted.

"enabling bidirectional communication"

"Bidirectional communication" is the counterpart to the
Claim 1 term "communicating bidirectionally." Hence the same
construction--transferring information in both directions, but
with no requirement that data must flow in both directions at the
same time--is adopted.

"interface with the communication medium"

Merit has misread the word "interface" in Claim 14 as a
noun, proposing a construction of "a shared electrical boundary"
(M. Mem. 25). But as A. Resp. 21 correctly points out,
"interface" is indisputably a verb in Claim 14. Despite some
reluctance to endorse such a classic patent-lawyer-talk term as
"therebetween," this Court accepts Arachnid's statement of the
plain meaning of the element in question: "the receiving means
and transmitting means of the dart games and inputting means and
outputting means of the CCD are configured to effect a data
exchange therebetween" (a reading to which Merit does not
object).

Claim 18 reads (10:19-32):

In an electronic dart game apparatus especially for use
in a dart league or tournament, the combination
comprising:

> electronic input means for receiving player data
> and league or tournament player pairings
> information from at least one external source and
> game statistics;

> storage means within the dart game apparatus for
> storing the external data and game statistics
> generated within the dart game; and

> output means for transmitting the player data and
> game statistics to a location external to the dart
> game.

Three terms in that claim require construction.

## "electronic input means"

This just-quoted means-plus-function element performs the
function of receiving player data and league or tournament player
pairings information from at least one external source as well as
the function of receiving game statistics (A. Mem. 52, M. Mem.
27). Merit argues that the element is indefinite (and therefore
incapable of any reasonable construction) because no structure in
the dart game is capable of receiving both player and league or
tournament information and game statistics. But that contention
is based on the faulty assumption that "game statistics" can
refer only to the information generated by games played on each
particular dart game. Instead there is nothing to prevent the
input of statistics into one game from another source--and

indeed, a preferred embodiment in Patent '155 describes a configuration in which "nonmaster" games at each location input their game statistics into the "master" game, which then sends all of the data on to the CCD.

Thus Merit's indefiniteness argument fails. "Electronic input means" is construed as including any one or more of a computer modem, player card reader/writers, electronic interlink or Spider Writer™ technology.

"storage means"

This just-quoted means-plus-function element performs the function of storing external data and game statistics generated within the dart game (A. Mem. 54, M. Mem. 28). As earlier, Merit asserts that this term should be construed to mean only non-volatile computer memory. For the same reasons as stated earlier, that assertion is rejected. For its part, Arachnid proposes that the term "storage means" should include player cards--but such cards are clearly not "within the dart game apparatus."

Patent '155 discloses computer memory and electronic memory circuitry as storage means within the dart game. That construction is adopted.

"output means"

Both parties agree that the function of this just-quoted means-plus-function element is the same as the "means for

transmitting" element in Claim 1 (A. Mem. 56, M. Mem. 28).
Consequently Merit's argument that the term should be construed
as limited to non-contact IC player card readers and computer
modems is again rejected. As earlier, "output means" are
construed to comprise player card reader/writers or other
portable data storage device interfaces and modems.

## Conclusion

This opinion, faithful to the teaching of <u>Markman</u>, has
construed the disputed terms in Claims 1, 3, 14 and 18 as a
matter of law. With that done, it now becomes necessary to
determine the next steps needed to move the case forward for
ultimate disposition. This Court sets a status hearing for
8:45 a.m. May 30, 2002.[15]

_Milton I. Shadur_
Milton I. Shadur
Senior United States District Judge

Date: May 16, 2002

---

[15] This application of the <u>Markman</u> canon was originally
tackled by this Court's outstanding law clerk Jennifer Smiley,
and her proposed draft opinion was--as always--exemplary. It is
just such excellent work product that makes it possible to handle
the caseload that the inexorable computer delivers to each
district judge, and it is even more noteworthy when the project
calls for the clerk's exploration of the arcane mysteries of
patent law in general and <u>Markman</u> in particular for the first
time. It must of course be understood that if any errors have
nevertheless found their way into this opinion, they are
ascribable to this Court and not to Ms. Smiley--this Court has
followed its invariable practice of parsing each law clerk's
draft word by word and sentence by sentence, so that the end
product must be placed at the Court's doorstep.